PURITY SUPREME, INC. *vs.* ATTORNEY GENERAL
(and a companion case[1]).

Middlesex.  February 7, 1980. — June 3, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Regulation. Administrative Law*, Regulation. *Attorney General. Consumer Protection Act. Due Process of Law*, Regulation. *Words*, "Regulation," "Interpreting," "Agency."

The Attorney General has the power under G. L. c. 93A, § 2 (*c*), to promulgate rules and regulations defining with specificity acts and practices which violate c. 93A, § 2 (*a*), and such rules and regulations have the same force of law as those of any "agency" as defined in c. 30A, § 1 (2). [765-775]

A regulation promulgated by the Attorney General under G. L. c. 93A, § 2 (*c*), which required merchants to affix the sale price to each item of consumer goods complied with c. 93A. [775-779]

A regulation promulgated by the Attorney General under G. L. c. 93A, § 2 (*c*), which required merchants to affix the sale price to each item of consumer goods was not inconsistent with decisions of the Federal Trade Commission or with court decisions interpreting 15 U.S.C. §§ 41 et seq. (1976). [779-780]

A regulation promulgated by the Attorney General under G. L. c. 93A, § 2 (*c*), was properly adopted pursuant to the procedural requirements of c. 30A. [780-782]

A supermarket which affixed prices of goods on cartons or shelves containing the items did not comply with a regulation promulgated by the Attorney General under G. L. c. 93A, § 2 (*c*), which required merchants to affix the sale price to each item of consumer goods. [782]

A regulation promulgated by the Attorney General under G. L. c. 93A, § 2 (*c*), which required merchants to affix the sale price to each item of consumer goods was not unconstitutional as applied to a supermarket. [782-783]

CIVIL ACTIONS commenced in the Superior Court on July 6, 1977, and July 12, 1977, respectively.

---

[1] *Commonwealth v. Purity Supreme, Inc.*

The cases were reported to the Appeals Court by *Ronan,* J. The Supreme Judicial Court granted a request for direct review.

*Jeffrey M. Freedman (Louis C. Miller* with him) for Purity Supreme, Inc.

*John T. Montgomery,* Assistant Attorney General, for the Attorney General.

QUIRICO, J. These cases were commenced by two complaints, one filed by the Attorney General seeking to enforce against Purity Supreme, Inc. (Purity), the Attorney General's Regulation XII (A) (1) (regulation), promulgated by him pursuant to his authority under G. L. c. 93A, § 2 (*c*), and the other filed by Purity against the Attorney General seeking a declaration that the regulation is unconstitutional and otherwise invalid. The cases were submitted to a judge of the Superior Court on the pleadings and on an agreement of all material facts. Thereafter the judge, at the written request of the parties, reported the cases to the Appeals Court, without decision, and they are now before us as the result of our allowance of the request of one of the parties for direct appellate review.[2]

The cases present an important question concerning the power of the Attorney General to promulgate substantive rules of law pursuant to G. L. c. 93A, § 2 (*c*). In our judicial review of the regulation, we do not concern ourselves with its wisdom or expediency, but only with its validity and constitutionality. We hold that the regulation is a valid exercise of the Attorney General's power under G. L. c. 93A, § 2 (*c*), with the force of law normally accorded to an agency's regulations, and that it is not unconstitutional as applied to Purity.

The regulation, which is sometimes referred to as the Item Price Regulation, was promulgated in 1971. It re-

[2] It is unnecessary at this stage of the proceedings to discuss the requests of the parties for interlocutory relief and the actions of the court thereon, since they will be disposed of by the entry of judgments pursuant to this decision.

quires merchants to affix the sale price to each item of consumer goods.[3] In February, 1977, Purity opened a retail store, which it called the Heartland Food Warehouse (Heartland), in Salem, Massachusetts. Heartland offers for sale groceries, household items, dairy products, meat, frozen food and produce. All items except delicatessen items are sold on a self-service basis. At the time the parties agreed to material facts, approximately eighty-one per cent of the items offered for sale had no price affixed to the individual item. Instead, Heartland notified the consumer of prices by signs on cartons or shelves which contained the items. Pencils were provided so that a consumer could mark each item if he so chose.

Heartland utilizes the Universal Product Code (UPC), a computerized checkout system. Imprinted on each item for sale is a symbol unique to that item, consisting of a series of short, black lines varying in width, darkness and density. The coded information identifies each item. Special electronic scanners "read" this information at the checkout counter, and a computer preprogrammed with the price of each item translates the scanned symbol and causes the special cash register to display visually the item description and price, and to print out that information on the register tape. The consumer receives a copy of this tape, and thus, for ninety-one per cent of the items thus sold, his record of purchases contains abbreviated descriptions of each item next to the price, as opposed to the present commonly known register tape showing a list of prices only.[4] Price changes can be made only at the computer terminal.

---

[3] Regulation XII (A) (1) reads: "*Failure to Disclose Price.* It is an unfair and deceptive act or practice for any person subject to this act to fail to affix to any goods offered for sale to the public the price at which the goods are to be sold or fail to disclose to a buyer prior to any agreement the price or cost of any service to be provided." 940 Code Mass. Regs. § 3.13 (1) (a).

[4] Nine per cent of the items printed out by the UPC contain only the notation "grocery." Some typical item descriptions from a sample register tape in the record are: "INST MAX HSE," "HELLMAN MAYO," and "BAN RL ON RG." According to the parties' agreed facts, similar UPC systems are presently in operation at approximately 15 retail food stores in the Commonwealth and 360 nationwide.

At the time the Attorney General promulgated the regulation, neither the UPC nor any electronic checkout system was commercially available.[5] The parties have agreed that the Attorney General knows of no fact tending to prove that the UPC system has caused any consumer to suffer actual financial loss, or that the system is per se "unfair" or "deceptive" within the meaning of any common law or statutory concept, including G. L. c. 93A. Nor has the Attorney General conducted any investigation to ascertain if there are any such facts.

Purity argues that it is technically in compliance with the regulation, because it affixes the price "at the point of customer decision [to purchase]," and visually displays the price on the cash register and the printout tape. Should that argument fail, it asserts that the regulation is "legislative" and not "interpretive" and therefore exceeds the Attorney General's statutory authority. Purity contends that even if the Attorney General has the power to promulgate regulations which are legislative in nature, this regulation fails because it is not aimed at regulating practices which are "unfair" and "deceptive" and because the regulation is inconsistent with decisions of the Federal Trade Commission (FTC) and court decisions interpreting the FTC Act, 15 U.S.C. §§ 41 et seq. (1976). Finally, Purity attacks the procedure through which the regulation was adopted, and raises constitutional objections.

1. *Source of Attorney General's power.* The Attorney General's power to seek injunctive relief derives from G. L. c. 93A, § 4. Jurisdiction is also conferred on this court by § 4, and by G. L. c. 231A, § 1. Also, G. L. c. 30A, § 7, as appearing in St. 1974, c. 361, § 3, provides that with certain exceptions not here material, "judicial review of any regulation . . . may be had through an action for declaratory relief in the manner and to the extent provided under chapter two hundred and thirty-one A." See *Cambridge*

---

[5] The parties agreed that the UPC system became commercially available in 1973.

*Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 502 (1973).

General Laws c. 93A is a comprehensive statute for the regulation of consumer and business transactions. "It is a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975). Section 1 of c. 93A provides certain definitions, and § 2 (*a*), inserted by St. 1967, c. 813, § 1, states the substantive core of the act: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Neither § 1 nor § 2 defines "unfair" or "deceptive," however, or indicates what "acts" are prohibited. Rather, § 2 (*b*) provides that "courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 [a] [1]), as from time to time amended." Further, § 2 (*c*) states that "[t]he attorney general may make rules and regulations interpreting the provisions of subsection 2 (a) of this chapter." The Attorney General's power to promulgate rules and regulations is limited by § 2 (*c*) only to the extent that such rules shall not be inconsistent with FTC and Federal court interpretations of the FTC Act mentioned in § 2 (*b*).

Chapter 93A was enacted in 1967, partly in response to an FTC policy to stop unfair practices on a State level before they become interstate problems. H. Alperin & R. Chase, Consumer Rights and Remedies § 111, at 253 & n.1 (1979). Section 2 (*a*) of c. 93A contains language identical to that of § 5 (a) (1) of the FTC Act (15 U.S.C. § 45[a][1] [1976]). The Massachusetts statute thus incorporates the extensive body of Federal administrative and decisional law under the FTC Act, *Slaney, supra* at 694 n.8, at least in so far as it relates to definitions of "unfair" and "deceptive."

2. *Status of Federal Trade Commission rules.* In 1973 the United States Court of Appeals for the District of Columbia held that the Federal act confers on the FTC the power to

promulgate trade regulations which have the force and effect of substantive law. *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), cert. denied, 415 U.S. 951 (1974).[6] The court examined concededly ambiguous legislative history from the time the FTC Act was first passed in 1914, and concluded that § 6(g) of the Act, 15 U.S.C. § 46(g) (1970), which stated that the Commission "shall also have power — . . . [f]rom time to time . . . to make rules and regulations for the purpose of carrying out the provisions of sections 41 to 46 and 47 to 58 of this title," should be liberally construed consistent with the background and purpose of the FTC Act. *Id.* at 689, 698. That purpose was to create a commission with independent enforcement powers against unfair or anticompetitive business practices. *Id.* at 687, 691.[7] Partly in response to *National Petroleum,* Congress in 1975 passed the FTC Improvements Act, Pub. L. No. 93-637, 88 Stat. 2193 (1975), codified at scattered sections of 15 U.S.C. The 1975 act granted the FTC new power to seek civil penalties for violation of its own rules and cease and desist orders, to seek restitution for consumers, and to make "rules which define with specificity acts or practices which are unfair or decep-

---

[6] Federal cases preceding *National Petroleum* had accorded force-of-law status to other agency regulations. See, e.g., *Mourning* v. *Family Publications Servs., Inc.,* 411 U.S. 356 (1973) (Federal Reserve Board, under 15 U.S.C. §§ 1601 et seq. [Truth-in-Lending Act]); *American Trucking Ass'ns* v. *United States,* 344 U.S. 298 (1953) (Interstate Commerce Commission, under 49 U.S.C. §§ 301 et seq.); *National Broadcasting Co.* v. *United States,* 319 U.S. 190 (1943) (Federal Communications Commission, under 47 U.S.C. § 303[r]); *Air Line Pilots Ass'n, Int'l* v. *Quesada,* 276 F.2d 892 (2d Cir. 1960) (Civil Aeronautics Board, under 49 U.S.C. §§ 1421 et seq.); *Public Serv. Comm'n* v. *FPC,* 327 F.2d 893 (D.C. Cir. 1964) (FPC, under 15 U.S.C. §§ 717 et seq.); *Morgan Stanley & Co.* v. *SEC,* 126 F.2d 325 (2d Cir. 1942) (SEC, under 15 U.S.C. §§ 79a et seq.).

[7] The rule at issue in *National Petroleum* involved disclosure, like the present case: it prohibited failure to post octane rating numbers on gasoline pumps at service stations. See *National Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672, 674 (D.C. Cir. 1973), cert. denied, 415 U.S. 951 (1974).

tive" and rules "for the purpose of preventing such acts or practices." [8]

3. *Status of Attorney General's regulations.* Before *National Petroleum,* Federal courts had held that FTC rules were only guides, e.g., *FTC* v. *Mary Carter Paint Co.,* 382 U.S. 46, 47-48 (1965), and directory rather than mandatory, e.g., *Floersheim* v. *Weinburger,* 346 F. Supp. 950, 952-953 n.4 (D.D.C. 1972). Purity is in effect asking us to adopt the position of the Federal courts prior to the *National Petroleum* decision. That position is that, while the definitions of "unfair competition" or "unfair or deceptive acts" promulgated by the designated agency are entitled to deference, courts ultimately are responsible for giving substantive content to the applicable enabling statute. See *FTC* v. *Texaco, Inc.,* 393 U.S. 223, 226 (1968). We believe this position is inconsistent with the purposes of c. 93A and with our decisions regarding the legal force of other agencies' regulations, and we decline to adopt it.

a. *Legal status of other agencies' regulations.* This court has on occasion held expressly that agency regulations have the "force of law." See *Commonwealth* v. *Cerveny,* 373 Mass. 345, 353 (1977) ("[T]he regulations [of the Rate Setting Commission] should be taken as 'law' . . . unless, indeed, there was something in the statute describing the powers of the [Commission] that stood in the way . . ."); *DaLomba's Case,* 352 Mass. 598, 603 (1967) (rules promulgated pursuant to legislative grant of power "generally have

---

[8] We are aware that the Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, was signed into law by President Carter on May 28, 1980. The 1980 Act significantly alters FTC rulemaking procedures and limits the power of the FTC to make rules in certain substantive areas. For the text of the 1980 Act, see 126 Cong. Rec. No. 69, at H3149-H3156 (May 1, 1980). Without engaging in a detailed analysis of the changes, we make two observations. First, we have held herein that G. L. c. 93A does not incorporate the procedural requirements of the FTC Act. Second, we have examined the substantive changes in the 1980 Act, and find none which applies to the rule in question in the present case.

the force of law"). See also *Niles* v. *Boston Rent Control Adm'r,* 6 Mass. App. Ct. 135, 149 (1978). We have frequently held that properly promulgated agency regulations are to be tested on review in the same manner as a statute. See, e.g., *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977); *Colella* v. *State Racing Comm'n,* 360 Mass. 152, 155-156 (1971).

Our decisions expressly or implicitly granting agency regulations status as "law" do not distinguish among word choices in the applicable enabling statutes. See *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524 (1979) ("shall, after proper notice and hearing, adopt rules and regulations governing the practice of medicine in order to promote the public health, welfare, and safety") (St. 1975, c. 362, § 3); *Cerveny, supra* ("shall promulgate rules and regulations for the administration of its duties and the determination of rates") (St. 1968, c. 492, § 3); *Consolidated Cigar Corp., supra* ("shall establish, by promulgation of regulations, such minimum standards relating to the rights of visitation under this section as will ensure the adequate protection of said rights") (G. L. c. 111, § 128H, as amended by St. 1971, c. 373); *Commonwealth* v. *Racine,* 372 Mass. 631 (1977) ("shall provide by regulation for the implementation by local boards of health, [sanitary] code enforcement agencies and housing inspection agencies of the provisions of this section") (G. L. c. 111, § 198, as amended by St. 1974, c. 449, § 2); *Cambridge Elec. Light Co., supra* ("may establish from time to time such reasonable rules and regulations consistent with this chapter as may be necessary to carry out the administration thereof") (St. 1969, c. 645); *Colella, supra* at 152 ("shall have full power to prescribe rules, regulations and conditions under which all horse or dog races . . . shall be conducted") (G. L. c. 128A, § 9, as amended by St. 1971, c. 96); *DaLomba, supra* ("may make rules consistent with this chapter for carrying out its provisions") (G. L. c. 152, § 5, as amended through St. 1972, c. 233).

b. *Authority of Attorney General to promulgate regulations under c. 93A.* The legislative history of c. 93A does

not illuminate the issue before us; indeed, there is almost no published material which sheds light on the intent of the Legislature in passing c. 93A.[9] Therefore we must look to other sources of State law.

The Attorney General's office is an "agency" as defined in the State Administrative Procedure Act, G. L. c. 30A, § 1 (2). An agency's powers to promulgate regulations "are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words." *Cerveny, supra* at 354. *Levy, supra.*

Purity argues that the use of the word "interpreting" in § 2 (*c*) indicates a legislative intent to restrict the Attorney General to issuing legal opinions and guidelines which do not have the force of law, and maintains that the regulation is "legislative" and therefore exceeds the statutory rulemaking power of the Attorney General. The State Administrative Procedure Act, however, defines "regulation" as including "the whole or any part of every rule, regulation,

---

[9] Chapter 93A began as a petition in the House for "legislation to protect consumers against unfair trade practices." 1967 House Doc. No. 4957. The House Ways and Means Committee reported it to the House on July 11, 1967. 1967 House Doc. No. 5025. J. House of Rep. 2268 (1967). The House passed House Bill No. 5025 on July 26, 1967. J. House of Rep. 2401 (1967). Neither 1967 House Doc. No. 4957, nor House Bill No. 5025, as passed by the House, contained § 2 (*c*) allowing the Attorney General to promulgate rules and regulations.

The Senate referred House Bill No. 5025 to the Senate Ways and Means Committee, which recommended to the full Senate on September 25, 1967, that House Bill No. 5025, "with an amendment," ought to be passed. J. Senate 2063 (1967). On September 27, 1967, the full Senate adopted "the pending amendment" and redesignated the amended bill Senate Doc. No. 1409. J. Senate 2086 (1967). The Senate passed No. 1409 on December 19, 1967. J. Senate 2472 (1967). The House approved No. 1409, as amended. J. House of Rep. 3061 (1967). The Governor signed it into law as St. 1967, c. 813, § 1, on December 26, 1967. Although the Senate Journal does not specify what the amendment was, we may infer from the fact that Senate Bill No. 1409 as published contains § 2 (*c*), that § 2 (*c*) was added by the Senate Ways and Means Committee. Nowhere is there an indication of why this was done. (The Massachusetts Senate and House maintain journals showing only what business was transacted, but do not publish debates in a manner similar to the Congressional Record.)

standard or other requirement of general application and future effect, including the amendment or repeal thereof, adopted by an agency to implement *or interpret* the law enforced or administered by it . . ." (emphasis supplied). G. L. c. 30A, § 1 (5). Chapter 30A mandates certain procedures for the agency adoption of regulations, and these procedures are discussed later in this opinion. The Attorney General's office is an "agency" under G. L. c. 30A, § 1 (2). Therefore the Attorney General's regulations are to be treated the same as those of any other agency of the State.

Furthermore, the use of the word "interpreting" does not signify on its face that the Attorney General is limited to advisory opinions, and that legally binding interpretations of "unfair" or "deceptive" must be made in the first instance by the reviewing court. Cf. *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 342-345 (1964). The purpose of an open-ended legislative use of the words "unfair" and "deceptive" was to allow for the regulation of future, as-yet-undevised, business practices.[10] See *Commonwealth* v. *DeCotis*, 366 Mass. 234, 242 (1974). The Attorney General is not constrained to propose abstract definitions of the words "unfair" or "deceptive"; rather, he is to identify particular business practices as falling within their scope. The only limitations on his interpretive power are that his definitions not be inconsistent with FTC and Federal court decisions (G. L. c. 93A, § 2 [*c*]), and the usual limitations that his regulations be neither arbitrary nor capricious. That the Legislature intended the Attorney General's regulations to set standards the violations of which would constitute violations of c. 93A is consistent with the over-all purpose of

---

[10] The advent of computerized pricing systems is itself a prime example of the reason the FTC Act and c. 93A were intentionally phrased broadly to empower administrative bodies to define new offenses. See generally *Mourning* v. *Family Publications Serv., Inc.* 411 U.S. 356, 365-366 (1973) (Truth in Lending Act broadly structured and Federal Reserve Board empowered to define by regulation to deal "not only with the myriad forms in which credit transactions then occurred, but also with those which would be devised in the future").

c. 93A and with both FTC practice and the practice in other States.[11]

c. *Judicial notice.* In *York* v. *Sullivan,* 369 Mass. 157, 160 n.2 (1975), we stated that this court will not take judicial notice of the Attorney General's regulations. This was not because they had no force of law, but because it was then the rule in Massachusetts that a court could not take judicial notice of administrative regulations.[12] *Passanessi* v. *C.J. Maney Co.,* 340 Mass. 599, 604 (1960). *Diaduk's Case,* 336 Mass. 5, 7 (1957). *Finlay* v. *Eastern Racing Ass'n,* 308 Mass. 20, 27 (1941). See also G. L. c. 233, § 75 (simplifying proof of administrative regulations but making them ad-

---

[11] As of 1977, 48 States plus Puerto Rico and Guam had enacted consumer protection laws. Uranga, Idaho and Oregon Consumer Protection Acts: Administrative Powers of the Attorneys General, 13 Willamette L.J. 455, 455 (1977). Many of these are "little FTC acts," as is G. L. c. 93A, and most are enforced by State Attorneys General. Tongren & Samuels, The Development of Consumer Protection Activities in the Ohio Attorney General's Office, 37 Ohio St. L.J. 581, 582 (1976). Note, Consumer Protection by the State Attorneys General: A Time for Renewal, 49 Notre Dame Law, 410, 411 & n.7 (1973). See also Pirozzolo, Chapter 93A: The Massachusetts Little FTC Act — A Potent Unexplored Remedy in Business Disputes, 62 Mass. L.Q. 77 *passim* (1977). Many States provide by statute that rules made by the enforcement agency shall have the force of law, or that violation of a rule will be prima facie evidence of violation of the statute. See, e.g., Ill. Ann. Stat. c. 121 1/2, § 264 (Smith-Hurd Supp. 1979) (force of law); Me. Rev. Stat. Ann. tit. 5, § 207(2) (prima facie evidence); N.J. Stat. Ann. § 56:8-4 (1964) (force of law); R.I. Gen. Laws § 6-13.1-7 (c) (Supp. 1979) (force of law); Vt. Stat. Ann. tit.9, § 2453 (d) (1970) (prima facie evidence). Other States have established by case law that rules made by their Attorneys General have the force of law. See, e.g., *Department of Legal Affairs* v. *Rogers,* 329 So. 2d 257, 261 n.2, 267 (Fla. 1976). Oregon provides by statute a list of acts which will be considered unfair or deceptive, and adds a "catch-all" category. See Or. Rev. Stat. § 646.608(1)(u) (1979). In order for an act to fall within the "catch-all" category, the Attorney General has to have first promulgated a rule which covers the act. See Or. Rev. Stat. § 646.608(4) (1979). See generally Uranga, *supra* at 474-475.

[12] In 1976, the Legislature amended § 6 of c. 30A to provide that "[t]he contents of the Massachusetts Register shall be judicially noticed and, without prejudice to any other mode of citation, may be cited by volume and page number." St. 1976, c. 459, § 5. The Attorney General's regulations are duly filed with the State Secretary and published in the Massachusetts Register. See 20 Code Mass. Regs. 940.

missible in evidence).[13] But see *Cohen* v. *Assessors of Boston,* 344 Mass. 268, 269 (1962). Therefore *York* does not preclude our holding that the Attorney General's regulations under c. 93A have substantive legal effect.

d. *Expertise.* Purity contends also that the Attorney General's office differs from the FTC in that the latter possesses greater expertise. It is true that one rationale of Federal courts for according legally binding status to FTC rules is that the FTC is "an expert body charged with the practical application of the statute." *FTC* v. *Texaco, Inc., supra.* Although the record before us is silent on the question of the "expertise" of the Attorney General and his staff in the areas of trade, commerce, and consumer protection,[14] Purity has shown nothing which would justify treating the Attorney General's office differently from other State agencies under the State Administrative Procedure Act. See generally *Slaney, supra* at 698 (discussion of consumer protection division of Attorney General's office); Richardson, The Office of the Attorney General: Continuity and Change, 53 Mass. L.Q. 5, 20 (1968).[15]

---

[13] The regulation in question here was properly incorporated into the record.

[14] Purity points to the agreed fact that at the time the regulation was promulgated the Attorney General had no one on his staff who was an expert in the retail food industry. Presumably FTC staff members are not experts in the substance of each business they regulate, but in the general areas of trade, commerce, antitrust, and consumer protection. Furthermore, Regulation XII (A) (1) applies to all sellers of goods or services, and is not an attempt to regulate the retail food industry only.

[15] We note also that the FTC Act has heavy historical roots in antitrust law. The Act as originally enacted in 1914 spoke only of "unfair methods of competition"; the phrase "unfair or deceptive acts" was added in 1938. 52 Stat. 111, c. 49, § 3 (1938). The 1938 amendment was probably in response to a leading case holding that a practice can be "unfair" even if it is not anticompetitive, *FTC* v. *R.F. Keppel & Bros.,* 291 U.S. 304 (1934). The 1938 amendment extended protection under the FTC Act to consumers as well as competitors. See H.R. Rep. No. 1613, 75th Cong., 1st Sess., 3 (1937).

Chapter 93A has no such roots. The Massachusetts Antitrust Act, G. L. c. 93, §§ 1-14A, added by St. 1978, c. 459, § 1, operates independently of c. 93A, except to the extent that § 11 of c. 93A (the businessman's

e. *Conclusion*: *legal status of the regulation.* We have not before faced the question whether the Attorney General's regulations under c. 93A have the force of law and the corollary whether an act or practice which violates a regulation also violates c. 93A. In several cases where plaintiffs in trial courts have alleged in their complaints that an act or practice violated c. 93A, § 2, and a regulation of the Attorney General, this question was not raised by the litigants and therefore was not discussed by us. See, e.g., *Chakrabarti* v. *Marco S. Marinello Assocs.*, 377 Mass. 419, 421 (1979); *J. & J. Enterprises, Inc.* v. *Martignetti*, 369 Mass. 535, 536-537 (1976). See also *Linthicum* v. *Archambault*, 379 Mass. 381, 387 (1979); *Heller* v. *Silverbranch Constr. Co.*, 376 Mass. 621, 626-627 (1978); *York, supra* at 160 (demand letter); *Slaney, supra* at 702.

*Commonwealth* v. *Diaz*, 326 Mass. 525, 527 (1950), reaffirmed the principle "that the Legislature may delegate to a board or an individual officer the working out of the details of a policy adopted by the Legislature." See *Racine, supra* at 635.[16] It is undisputed that the Attorney General could not have promulgated a regulation disallowing a practice expressly permitted by State statute. See *Commonwealth* v. *Rivkin*, 329 Mass. 586, 588-589 (1952) (total prohibition of sidewalk sale of ice cream by local health board exceeds statutory power to adopt regulations for sanitary food conditions, when another State statute allows out-

remedy) was amended by St. 1978, c. 459, § 3, to direct courts to consider decisions under c. 93 when interpreting "unfair methods of competition" in c. 93A, § 11, actions.

The Massachusetts Antitrust Act delegates investigative and enforcement powers to the Attorney General. Presumably therefore the Legislature intends his powers to be very similar to those of the FTC, and it expects that his staff will have expertise in the areas of trade, commerce, antitrust and consumer protection. See G. L. c. 93, §§ 8, 9; G. L. c. 93A, §§ 4-8 (investigative and enforcement powers of Attorney General under Antitrust Act and Consumer Protection Act, respectively).

[16] Purity does not argue that a delegation to the Attorney General to determine substantive violations of c. 93A, without specific statutory standards, would be improper. See generally *Opinion of the Justices*, 368 Mass. 831 (1975).

door food sale); *Commonwealth* v. *Johnson Wholesale Perfume Co.*, 304 Mass. 452, 456-457 (1939) (regulation adding requirement that wholesaler sign guaranty to retailer that product not adulterated or misbranded, when unsigned guaranty by statute provides immunity to criminal prosecution, invalid). Further, he could not promulgate regulations which expand upon the statutory standards (as incorporating FTC and Federal court decisions) to include acts which are not, and have no potential to become, unfair or deceptive. His regulations will be subject to court challenge on the grounds that he has exceeded his statutory powers in defining "unfair" or "deceptive," or that a regulation is constitutionally invalid facially or as applied. See *National Petroleum, supra* at 693. They will be accorded the same deference as statutes upon review, however.

For all the foregoing reasons, we hold that the Legislature has, by G. L. c. 93A, § 2 (*c*), delegated to the Attorney General the power to promulgate rules and regulations defining with specificity acts and practices which violate G. L. c. 93A, § 2 (*a*). These rules and regulations have the same force of law as those of any "agency" as defined in G. L. c. 30A, § 1 (2).

That the Attorney General has the power to promulgate regulations with the force of law is not conclusive on the question whether he has validly done so in the present case, a question to which we now turn.

4. *Validity of the regulation.* Purity argues that the Attorney General has exceeded his authority under § 2 (*c*) because the regulation is inconsistent with FTC policy and with c. 93A, in that (a) the acts proscribed by the regulation are not in themselves unfair or deceptive; (b) FTC consent decrees have allowed pricing practices similar to that employed by Heartland, see 42 Fed. Reg. 23,843 et seq. (1977); and (c) the regulation was not adopted according to proper procedure.

a. *Whether the regulation complies with c. 93A.* i. *Standard of review.* The standard by which we are to determine whether the Attorney General has exceeded the authority

delegated to him under G. L. c. 93A, § 2 (*c*), is well established by Massachusetts precedent. We are "bound to test the regulations by the same standard which would apply to a statute. Thus, we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp., supra* at 855. *Grocery Mfrs. of America, Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 80 (1979). *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.,* 377 Mass. 282, 293-294 (1979). *Colella, supra* at 155-156. *Druzik* v. *Board of Health of Haverhill,* 324 Mass. 129, 138 (1949). A court may not substitute its judgment for that of the Legislature if the regulation comports with the power delegated, cf. *Colella, supra* at 156, and Purity has the burden of proving on the record "the absence of any conceivable ground upon which [the rule] may be upheld." *Id.* Purity may not meet its burden by arguing that the record does not affirmatively show facts which support the regulation. *Colella, supra. Mile Road Corp.* v. *Boston,* 345 Mass. 379, 382-383, appeal dismissed for want of a substantial Federal question, 373 U.S. 541 (1963).

The question before us is not whether the item price regulation is sound policy, but "whether the regulation bears a reasonable relation to the goal of consumer protection." *Grocery Mfrs., supra* at 85. That in turn depends on the purpose and meaning of c. 93A.

The over-all purpose of c. 93A is that of "providing proper disclosure of information and a more equitable balance in the relationship of consumers to persons conducting business activities." *Lowell Gas. Co.* v. *Attorney Gen.,* 377 Mass. 37, 51 (1979). *Mechanics Nat'l Bank* v. *Killeen,* 377 Mass. 100, 110 (1979). *DeCotis, supra* at 238.

ii. *What constitutes "unfair" and "deceptive."* This court has declined to adopt a static definition of either "unfair" or "deceptive." "It would doubtless be helpful if there were a clear definition of conduct which may constitute a

violation of c. 93A. Such a definition would assist litigants in identifying those cases which have only the normal incentives for settlement as distinguished from those which truly implicate the incentives under c. 93A." *Whitinsville Plaza, Inc.* v. *Kotseas,* 378 Mass. 85, 100 (1979). We concluded in *Whitinsville* that there had not yet been "a sufficient amount of litigation from which to develop definitions." *Id.* See *DeCotis, supra* at 241-242. The following definitions offer some guidance, however.

The FTC has promulgated a general definition of what is "unfair" though not necessarily deceptive: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." 29 Fed. Reg. 8355 (1964). A practice may be "deceptive" if it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Lowell Gas Co., supra* at 51. *York* v. *Sullivan, supra* at 162.[17]

---

[17] Our cases and those of the Appeals Court have begun the process of judicial inclusion, and illustrate the principle that unfairness or deception must be judged from the circumstances. The following cases have held that the act in question was unfair or deceptive within the meaning of § 2 (*a*). *Linthicum* v. *Archambault,* 379 Mass. 381, 387-388 (1979) (material breach of warranty by roofing contractor). *Lowell Gas Co.* v. *Attorney Gen.,* 377 Mass. 37, 50 (1979) (allocation of short-term debt interest expense to inventory cost of gas charged to consumers). *Heller* v. *Silverbranch Constr. Corp.,* 376 Mass. 621, 626-627 (1978) (failure by contractor to disclose drainage problem to prospective home buyers). *Schubach* v. *Household Fin. Corp.,* 375 Mass. 133, 137 (1978) (practice permitted under State law may, in certain circumstances, be unfair or deceptive). *Commonwealth* v. *Gustafsson,* 370 Mass. 181, 190-191 (1976) (total prohibition of "For Sale" signs in mobile home park). *York* v. *Sullivan,* 369 Mass. 157, 162 (1975) (failure of landlord to advise prospective tenants of pending rent increase). *Southbridge Water Supply Co.* v. *Department of Pub. Utils.,* 368 Mass. 300, 310 (1975) (dictum) (overcharging of customers by utility). *Slaney* v. *Westwood Auto, Inc.,*

Undoubtedly if a definition could be developed from the cases, to provide a "bright line" against which businesses might judge their conduct, it would prove helpful both to avoid litigation and to facilitate the settlement process. The rules and regulations of the Attorney General will not necessarily exhaust the field of unfair or deceptive acts potentially violative of c. 93A. They will, however, provide notice to persons engaged in trade or commerce of acts for which injunctions and penalties may be sought under c. 93A, thus mitigating possible vagueness of a statute intentionally left open-ended to encompass new acts. See *DeCotis, supra* at 242.

iii. *Whether the UPC system is "unfair" or "deceptive."* While it does not appear that the UPC system, if it functions effectively, is unfair or deceptive per se, the Attorney General argues that the system does not entirely lack the potential for both unfairness and deception, even caused by good faith error. His argument is that price changes may be made at the computer terminal and stores may fail to change signs until hours or even days later, resulting in un-

---

366 Mass. 688, 702 (1975) (failure to fulfil warranty obligations as defined in Attorney General's rule). *Commonwealth* v. *DeCotis*, 366 Mass. 234, 241 (1974) (charging resale fee to mobile home park tenants without rendering any service). *Noyes* v. *Quincy Mut. Fire Ins. Co.*, 8 Mass. App. Ct. 84, 91-92 (1979) (unfair or deceptive acts as set forth in G. L. c. 176D). *Goes* v. *Feldman*, 8 Mass. App. Ct. 84, 91-92 (1979) (improper retention of security deposit by landlord). *Frank J. Linhares, Inc.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 622-623 (1976) (refusal to deliver truck to which plaintiff had right of possession unless plaintiff would agree to release defendant from warranties on repairs).

The following cases have held that the act or practice in question was not unfair or deceptive within the meaning of § 2 (*a*). *Mechanics Nat'l Bank* v. *Killeen*, 377 Mass. 100, 109 (1979) (selling of collateral by bank in erroneous belief that it could rightfully sell). *Kantrovitz* v. *Academy of Physical & Social Dev. Corp.*, 370 Mass. 858 (1976) (commencing illicit sexual relations with plaintiff's wife on guise of counseling plaintiff's son). *PMP Assocs.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (refusal to sell advertising space, without more). Cf. *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 44-45 (1975) (allegation that defendant caused "severe emotional distress" not sufficient to state cause of action under G. L. c. 93A, § 9).

disclosed overcharges in clear violation of c. 93A, that signs may become obscured or incorrectly placed, or items may be placed on incorrect shelves, and that time-conscious consumers may well forgo marking each item with pencils provided therefor.[18]

Regulation in the consumer field may be preventive. See *Floersheim, supra* at 955. We cannot say that the Attorney General has acted unreasonably in attempting to prevent potentially unfair acts or practices before they pose a threat to consumers. He has acted within his statutory authority, and the method he has chosen is reasonable.[19] We are aware of the fact that if Purity has to operate under a dual system (UPC and item marking, the latter being mandated by the regulation), some of the additional cost of item marking may be reflected in increased prices to the consumer. This extra cost of the dual system does not support Purity's claim of unreasonableness. Cf. *DeCotis, supra* at 241 n.5. It is a factor which may be considered by the administrative rule-making body, but there is no requirement that such body choose the least restrictive alternative. *Consolidated Cigar Corp., supra* at 853, and cases cited. Purity has failed to meet its burden of demonstrating that the regulation lacks any rational relationship to the goals of c. 93A.

b. *Consistency with FTC policy.* In support of its contention that the regulation is inconsistent with FTC decisions, Purity points to cases in which consent decrees have

---

[18] The Consumer Protection Act will best be effectuated when consumers participate in its enforcement. In order to discover an overcharge under the UPC system a consumer would have to rely on his own marking of an item or his memory of the sign price. Item pricing will enhance the over-all consumer protection scheme by removing these obstacles.

[19] The case called to our attention by Purity in its reply brief, *Katharine Gibbs Schools (Inc.)* v. *FTC* [1979] 5 Trade Reg. Rep. (CCH) ¶ 63,077 (2d Cir. Dec. 12, 1979), is distinguishable from the present case in that the preventive FTC rule overturned in *Katharine Gibbs* failed to define with specificity any act or practice which might potentially be unfair or deceptive. Instead, it required, among other things, schools to institute a tuition refund policy on a strict pro rata basis in order to prevent "indiscriminate enrollment." See *id.* ¶ 63,077, at 77,343.

allowed the use of UPC systems. The decrees required item pricing of goods which are advertised but allowed the advertised price to be "clearly and conspicuously posted at the point of display" in the case of "stores equipped with devices which 'read' an identification code marked on the packaging of items, and which transmit the information to a computer . . . ." See 42 Fed. Reg. 23,843-23,847, 23,849-23,851 (1977).

We note first that there is no provision in the FTC Act and no FTC regulation expressly precluding States from requiring item pricing. Nor is there an FTC regulation requiring item pricing. States are not forbidden, however, from adopting rules more restrictive than those of the FTC. See generally *Mobil Oil Corp.* v. *Attorney Gen.*, 361 Mass. 401 (1972). *Mobil Oil* was a preemption case, and did not involve the proscription of c. 93A, § 2 *(c)*, that the Attorney General's rules may not be inconsistent with FTC decisions. *Mobil Oil* held, however, that a Federal regulatory scheme for lotteries did not preempt a State statute totally prohibiting the same type of lottery. A similar rationale applies here, especially in light of the fact that the UPC pricing system has the potential for unfairness and deception. Furthermore, the entry of such consent decrees in past cases would not prevent the FTC from enacting a rule requiring item pricing should it find that electronic scanner systems work unfairness or deception at some future time.[20]

c. *Promulgation procedure.* Purity alleges that the regulation was not adopted according to proper procedures. As we stated above, the office of the Attorney General is an "agency" within the meaning of G. L. c. 30A, § 1 (2), for it is a "department . . . of the state government . . . authorized by law to make regulations . . . ." Cf. *Bay State Horse Rac-*

---

[20] We note that the FTC consent decrees allowing posted signs near items marked with electronically scanned pricing codes also required the retail food stores to sell at or below advertised prices, and required stores to post signs advising consumers to report to the store manager any discrepancy between advertised price and price charged. See 42 Fed. Reg. at 23,846, 23,847, 23,851.

*ing & Breeding Ass'n* v. *State Racing Comm'n,* 342 Mass. 694, 700-701 (1961). Its regulations meet the definition in G. L. c. 30A, § 1 (5) ("adopted by an agency to implement or interpret the law enforced or administered by it"). Therefore the procedural requirements of c. 30A apply to the regulation in question.

The parties have stipulated that a public hearing was held before the adoption of the regulation, and that notice was given "in accordance with the standards contained in Chapter 30A." Because he held a public hearing, the Attorney General complied with the requirements of § 2 of c. 30A, which are more stringent than those of § 3. Section 2 requirements include publication, filing of the notice with the State Secretary, and delivering or mailing notice to persons or groups "filing written request for notice of agency rule making proceedings." Purity does not allege that it did not receive notice of the hearing or an opportunity to present its views. It alleges only that notice was not widely publicized, and that the Attorney General offered no statement of his reasons for adopting the regulation.

There is no requirement that the Attorney General include a statement of facts supporting the regulation. *Grocery Mfrs., supra* at 79. *Cambridge Elec. Light Co., supra* at 490-491. Purity contends that the Attorney General must meet the procedural requirements imposed on the FTC, one of which is a statement of the basis for adoption. See 15 U.S.C. § 57a. This argument is without foundation. General Laws c. 93A, § 2 (*b*), directs courts to consider the FTC Act only in regard to definitions of "unfair" and "deceptive";[21] nowhere does c. 93A incorporate

---

[21] Section 2 (*b*) of c. 93A, as amended by St. 1978, c. 459, § 2, states that "[i]t is the intent of the legislature that in *construing paragraph (a) of this section* in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended" (emphasis supplied). Paragraph (*a*) of G. L. c. 93A, § 2, inserted by St. 1967, c. 813, § 1, reads: "Unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

FTC procedure. The State Administrative Procedure Act (c. 30A) applies, and the Attorney General has met the procedural requirements of that Act. See generally, *Grocery Mfrs., supra* at 79. The record discloses no irregularity in procedure which would call into question the validity of the regulation.

We note that the parties have agreed that the Attorney General has offered to hold a public hearing on the UPC. This would provide a forum to examine whether it would be in the public interest to exempt UPC systems from the regulation. Purity could have availed itself of this opportunity it had but did not do so.

5. *Purity's compliance.* Purity contends that in any event it complies with the regulation because it affixes prices to shelves or cartons. The regulation requires sellers to affix prices "to any goods." There is nothing in the rule or in the record before us to indicate that the phrase "to any goods" was intended to include the shelves on which the goods were stored or displayed or the cartons in which they were contained. In the absence of clear error, the interpretation an administrative body gives to its own rule is entitled to deference. *Finkelstein* v. *Board of Registration in Optometry,* 370 Mass. 476, 478 (1976). *FTC* v. *Anderson,* 442 F. Supp. 1118, 1127 (D.D.C. 1977). Cf. *Cleary* v. *Cardullo's Inc., supra* at 342-345. A court will overturn such an agency interpretation only if it is "arbitrary, unreasonable, or inconsistent with the plain terms of the rule itself." *Finkelstein, supra.* A general term of a statute may not be construed differently from its plain meaning, especially in the absence of any evidence of legislative or administrative intent so to construe it, *Mile Road Corp., supra,* and we may apply that same principle to the regulation. Therefore, the word "goods" must be taken to mean the individual articles for sale, as the Attorney General has construed it. Purity is not in compliance with the regulation.

6. *Equal protection.* Purity's equal protection argument is essentially that by the enforcement of the regulation

against a supermarket, the Attorney General is treating Purity unequally with no rational basis for doing so. As an example, Purity says this action would result in mandatory price affixation to "fish in a supermarket, but not to fish in a fish store."

Such a selective enforcement argument lacks substance. First, there is no such distinction on the face of the regulation; it applies to "any person subject to this act [c. 93A]." Second, the Attorney General is not required to enforce the regulation against all potential violators simultaneously; he may proceed in an orderly fashion. See *Consolidated Cigar Corp., supra* at 854; *Mobil Oil Corp., supra* at 417; *Ger-Ro-Mar, Inc.* v. *FTC*, 518 F.2d 33, 35 (2d Cir. 1975). Furthermore, it is conceivable that the Attorney General could properly decide to treat supermarkets differently from small fish stores. A conceivable rational basis for such treatment could be that the former are generally self-service, whereas the latter may involve service by a salesperson pursuant to a customer request for a certain quantity of fish from a tray containing a price. The important factor is that the consumer be aware at the time of decision to purchase how much he will pay for the item.

7. *Due process.* Purity's due process argument is that the regulation "arbitrarily interferes with Purity's right to conduct its business." Purity maintains that the means chosen to effectuate the purposes of the regulation are arbitrary and unreasonable. It appends to its brief a consent decree reached by the Attorney General and First National Stores, Inc. This agreement allows First National to omit affixing prices to "non-prepackaged food" such as loose fruits and vegetables and delicatessen items, individual packages of cigarettes, and "small consumer commodities" weighing less than two ounces and costing less than thirty cents, such as packages of chewing gum.

Purity makes no showing that such exceptions to the regulation are not being allowed as to its stores. Rather it asserts that the allowance of such exceptions illustrates arbitrary and irrational enforcement. We disagree. It is true

that the regulation carried to absurd limits potentially allows the Attorney General to require price affixation to each piece of loose fruit. Exemption of such items, as long as the exemptions are applied to all sellers of similar items, is a reasonable exercise of the Attorney General's discretionary enforcement power as granted by G. L. c. 93A, §§ 4-8. There is no due process violation.

8. The cases are remanded to the Superior Court, where judgments shall be entered as follows. In case number 77-3436, that the injunction was validly issued and shall continue in full force and effect. In case number 77-3530, that the Attorney General had the statutory authority to adopt Regulation XII (A) (1), that he complied with the procedural requirements of law in adopting it, and that the regulation may constitutionally be applied to Purity.

*So ordered.*