Ford, J.
The plaintiffs’ complaint alleges deceit and violation of G.L.c. 93A against all three defendants, as well as breach of contract against the defendant Pauline Ghitalla (hereafter “Ghitalla”). In December of 1997, the deceit and breach of contract counts were tried to a jury, and the jury returned a verdict in favor of the plaintiffs against each defendant in the amount of $24,881.20. The Chapter 93A claims were tried simultaneously with the common law counts, and the parties agreed that I would decide the 93A claims independently of the jury’s verdict. See Wyler v. Bonnell Motors, Inc., 35 Mass.App.Ct. 563, 566 (1993). Accordingly, on those claims (Counts II, IV, and VI of the plaintiffs’ complaint), I find the facts to be as follows.
FINDINGS OF FACT
1. The plaintiffs Craig Piers (hereafter “Craig”) and Bridget Piers (hereafter “Bridget”) are husband and wife and are the parents of two boys, Ryan and Austin. Austin was bom on February 16, 1994.
2. Shortly after Austin was bom, the plaintiffs decided that they wished to purchase a house. Accordingly, in the spring of 1994-they contacted Wheeler & Taylor, Inc. (hereafter “Wheeler & Taylor”), a real estate brokerage firm with offices in Great Barrington. They chose Wheeler & Taylor because they had dealt with the firm on previous occasions in connection with rental properties and had been very satisfied.
3. Dorothy King (hereafter “King"), an employee of Wheeler & Taylor, was assigned by the firm to assist the plaintiffs.
4. The plaintiffs told King that they were looking for an old house but they emphasized that it had to be deleaded. Both plaintiffs knew that lead paint could be extremely hazardous to children, and they made it very clear to King that their requirement that the house be deleaded was firm and nonnegotiable.
5. King replied that it would be very difficult to find an old house which had been deleaded. She flipped through a number of listings and excluded all those which she knew contained lead paint. After giving the matter some thought, King said that she knew of an old house in Housatonic which was owned by Ghitalla, one of her co-workers at Wheeler & Taylor. King told the plaintiffs that she was sure that Ghitalla’s house had been deleaded.
6. Ghitalla was in fact an employee of Wheeler & Taylor and had been a licensed real estate agent since 1993. In 1989, she purchased the house in question. It was located at 1047 Main Street in Housatonic, and had been built in 1830. When she purchased the house, Ghitalla was living at 1049 Main Street in Housatonic. According to Ghitalla, her intention was to refurbish the house at 1047 Main Street and move into it, and then to sell the house at 1049 Main Street. However, in the spring of 1994 the real estate market had fallen off and she was unable to sell the house at 1049 Main Street. Therefore, she decided instead to attempt to sell the house which she had rehabilitated.
7. Ghitalla paid $105,000 for the house, which she purchased from an estate. There was no discussion about the possible presence of lead paint in the house when she purchased it, and she never did any testing for the presence of lead paint. She did perform extensive renovations on the house, which included the taking down of walls and ceilings, the removal of partitions, the installation of new plumbing and heating systems, the stripping and refurbishing of wood work, and the renovation of the fireplace. To use Ghitalla’s words, the house was completely “gutted” and restored. The total cost of the restoration was approximately $125,000. However, at no time while the work was being done was any thought given to the possible presence of lead paint. The house was never deleaded by a licensed deleader, and no testing for the presence of lead paint was done either before or after the restoration of the house was completed.
8. When Ghitalla decided to sell the house, she listed it for sale with Wheeler & Taylor, the firm with which she was employed. As of the spring of 1994, she had acted as a real estate agent in connection with a sale of property on only one prior occasion. On the listing sheet which she prepared, Ghitalla checked off “No” next to the question of whether there was lead *411 paint in the house. She did so because, having in mind all the work that she had done on the house and the fact that much of the wood had been stripped and gutted, she simply assumed that there could no longer be any lead paint in the house. She now admits that her answer to that question should have been “Unknown.” She did not explicitly represent to anybody at Wheeler & Taylor that the house had been deleaded by a licensed deleader. No one at the firm ever asked her that question, and she never discussed that precise issue with King. She simply informed King that all wood surfaces in the house had been stripped, and King evidently joined in her unfounded assumption that there could not be any lead paint in the house.
9. King had been employed by Wheeler & Taylor since 1976 and had been involved in numerous real estate transactions. She very clearly knew that the older a house was, the more likely it was to contain lead paint. She also knew that Ghitalla’s house had been built in approximately 1830. In addition, she was aware that the only way to be certain whether there is lead paint in a house is by way of a lead paint inspection. Nevertheless, King never requested a certificate of compliance with the lead paint laws from Ghitalla, and she had absolutely no reason to believe that Ghitalla had ever had a lead paint inspection done.
10. Even though Ghitalla never represented to King that the house had been deleaded by a licensed deleader, and even though King never saw a certificate of compliance or the results of any lead inspection, she affirmatively represented to the plaintiffs on more than one occasion that the house had been deleaded. There was some conflict in the evidence as to whether King represented that the house had been “deleaded,” or was simply “free of lead.” I resolve that issue in the plaintiffs’ favor, and I accept their testimony that King used the word “deleaded.”
11. After seeing the house, and after being assured that it had been deleaded, the plaintiffs were favorably impressed. They went back to the house on other occasions, and on one such occasion Bridget spoke to Ghitalla without King being present. Bridget mentioned to Ghitalla that finding a deleaded house was veiy important to her and her husband. Ghitalla did not deny that the house had been deleaded.
12. Ghitalla’s asking price was $169,000. In July, the plaintiffs offered her $145,000, and she accepted the offer immediately. A Purchase and Sale Agreement was prepared and signed on July 29, 1994. Paragraph 33 of that agreement provides as follows: “Seller warrants and represents that the premises are free of lead paint..."
13. The Purchase and Sale Agreement provided that the plaintiffs were entitled to thoroughly inspect the house prior to closing and to rescind the agreement if they were not satisfied with the results. However, the plaintiffs chose not to have a lead paint inspection done. In making that decision, the plaintiffs trusted the word of King and Ghitalla, two professional real estate agents, and relied upon the excellent professional reputation of Wheeler & Taylor. In addition, when they saw the house they observed that young children were living in it.[1] That fact, as well as the fact that their structural inspection confirmed that a great deal of work had recently been done on the house, just as Ghitalla had said, reassured them that King’s representation that the house had been deleaded was in fact true.
14. After the contract was signed but before the closing, the plaintiffs received a lead disclosure form in the mail from Wheeler & Taylor. Attached to the form was King’s business card, on which King had written, “Don’t let this scare you.” King did so because she felt that the form was “scary,” and she wanted to “lighten things up.” The plaintiffs were understandably confused, and accordingly Craig telephoned King. He informed King that he would not sign the form because it was inapplicable to him, in that he had been assured that he was buying a deleaded house. King responded that it was “just a formality,” and that he should sign it and return it to her for her records. Craig still refused to sign the form, and told King, “It doesn’t apply to me.” He also told King that, if there was anything about the house which he should know, to please “tell me now.” King seemed frustrated, but said nothing further about the issue.
15. The transaction closed on September 30, 1994. At the closing, King again gave the lead disclosure form to Craig and told him to sign it for her records. Craig responded, “Dorothy, we’ve been through this. It doesn’t apply to me, and I won’t sign it.” King merely shrugged her shoulders.
16. Because Ghitalla was an employee of Wheeler & Taylor, the firm took no corporate fee for its services. However, King, as the selling agent, did receive a 6% commission.
17. Shortly after the plaintiffs moved into the house, they began sanding and repainting. In February of 1995, they took Austin to his pediatrician for his one year “wellness checkup.” During the course of that examination, the doctor ascertained that Austin had been poisoned by lead paint.
18. Accordingly, a licensed deleader came to the plaintiffs’ home and determined that there were high levels of lead paint in various locations throughout the house. The plaintiffs were not able to live in their home for several weeks, and had to pay various individuals to rip out and replace all wood surfaces in the house. They spent $24,881.20 on that work. I find that such work was reasonably necessary, and that the costs associated therewith are fair and reasonable.
19. On December 4, 1995, the plaintiffs, through counsel, wrote letters to each of the three defendants, setting forth the facts and making a demand for relief *412 pursuant to G.L.c. 93A. No settlement offer was received from any defendant. Accordingly, the plaintiffs commenced this lawsuit on March 18, 1996.
RULINGS OF LAW
1. G.L.c. 93A, §2 provides: “. . . unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” The term “in the conduct of any trade or commerce” was intended to refer specifically to activities occurring in a “business context,” and this issue is adjudged according to the facts of each case. Rousseau v. Gelinas, 24 Mass.App.Ct. 154, 158 (1997). The determination of the presence of a “business context” depends upon such relevant factors as the nature of the transaction, the character of the parties involved, the activities in which the parties participated, and whether the transaction was motivated by business or personal reasons. Nei v. Burley, 388 Mass. 307, 317 (1993). Clearly, King, the real estate broker who received a commission for her services, and Wheeler & Taylor, the agency which employed her, were acting in a business context. The issue is less clear with respect to Ghitalla. In Lantner v. Carson, 374 Mass. 606 (1978), the Supreme Judicial Court held that the purchasers of a residence had no remedy under Chapter 93A against private individuals who sold them the residence in a strictly personal and private context and not in the ordinary course of a trade or business. However, in this case, I conclude that Ghitalla was not acting in a purely personal sense. In spite of her testimony that she purchased and refurbished the house solely with the intent to move into it, I believe that she had an investment motive as well. At the very least, she intended to combine the restoration of that house with the sale (hopefully, from her perspective, at a profit) of the adjacent premises in which she was then residing. She personally oversaw the restoration of the house, supervising the tradesmen and choosing the materials with an eye towards enhancing its value. It appears to me that she was actively involved in virtually every stage of the transaction. In addition, she herself was a real estate agent, and because she was employed by the very firm which she retained as the selling agent, she derived a financial benefit when that firm agreed to waive its corporate fee. Considering all the circumstances relevant to this issue, I rule that Ghitalla’s sale of the house occurred in a “business context,” and therefore that the provisions of G.L.c. 93A apply to her.
2. The defendants’ reliance on Underwood v. Risman, 414 Mass. 96 (1993) is misplaced. Underwood was a case of nondisclosure, and the Supreme Judicial Court held that “there is no liability for failing to disclose what a person does not know.” Id. at 100. In the case at bar, the plaintiffs’ theory is not that the defendants failed to disclose the presence of lead paint in the house, but that they affirmatively misrepresented the condition of the house relative to the presence of lead paint. Ghitalla warranted in writing that the premises were free of lead paint, and King went one step further by orally informing the plaintiffs on more than one occasion that the house had been deleaded. Both statements were clearly false, and I rule that they constituted the type of “unfair or deceptive acts or practices” proscribed by Chapter 93A, §2. An act or practice is “deceptive” if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted. Purity Supreme v. Attorney General, 380 Mass. 762, 776-78 (1980). It is abundantly clear that the plaintiffs would not have purchased the house if they knew that it contained lead paint, and that they were misled into making the purchase solely by virtue of the defendants’ misrepresentations.
3. To establish a Chapter 93A violation, it is not necessary to show that the defendant intended to deceive or knew that a representation was false; merely negligent conduct may suffice, although it will not support an award of multiple damages. Wang Laboratories, Inc. v. Business Incentives, Inc., 398 Mass. 854, 858 (1986); Swanson v. Banker’s Life Co., 389 Mass. 345, 349 (1983). At the very least, the defendants’ conduct in affirmatively representing that the house was free of lead paint and/or that it had been deleaded, in the absence of any actual knowledge of those facts, was negligent.
4. Chapter 93A, §9(3) provides in part: “. . . if the court finds for the petitioner, recovery shall be in the amount of actual damages or $25, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said §2 or that refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said §2.” A violation is “willful” if the defendant knew that she did not know whether the fact represented was true or false; i.e., if she made the representation without knowing whether it was true or false and with reckless disregard for whether it was true or false. A violation is “knowing” if the defendant knew that a fact represented to be true was in fact not true. Datacomm Interface, Inc. v. Computer World, Inc., 396 Mass. 760, 779-80 (1986); Shaw v. Rodman Ford Truck Center, Inc., 19 Mass.App.Ct. 709, 711-12 (1985). In this case, I find and rule that both Ghitalla’s and King’s misrepresentations were willful. Both women knew that the house had never been deleaded by a certified deleader and that it had not been inspected for the presence of lead paint. Therefore, they could not possibly have known whether lead paint was present in the house. Nevertheless, they affirmatively represented that it was free of lead paint, and, in King’s case, that it had actually been deleaded. I find that conduct to fall squarely within the definition of willful conduct.
5. I find King’s behavior to have been particularly egregious. King was a highly experienced real estate *413 professional and clearly understood the dangers of lead paint in a house that was to be occupied by young children. In spite of the fact that Ghitalla never told her that the house had been deleaded, King represented to the plaintiffs that it had been. She then encouraged the plaintiffs to ignore the provisions of the lead paint disclosure form, and stated that it was a mere formality which she needed only for her records. If the form was "scary,” it is because it was intended to be. It was meant to impress upon prospective purchasers of real estate the dangers of lead paint, and to encourage them to obtain a lead paint inspection if there are any questions whatsoever about the presence of lead paint in a home. By trivializing that disclosure form as she did, King effectively dissuaded the plaintiffs from obtaining their own lead paint inspection. I believe that King did so in an attempt to aid her friend and co-worker, Ghitalla, who she knew to be in some financial difficulty and who was very anxious to sell the home. Her cavalier treatment of an extremely serious issue exposed a young family to a severe health hazard and resulted in the poisoning of an innocent child. Under these circumstances, I believe that the sanction of multiple damages provided by Chapter 93A is appropriate.
6. Because I find Ghitalla’s conduct to have been a willful violation of Chapter 93A, §2, I hereby award double damages against her in the amount of $49,762.40. Because I find Kings level of culpability to be even higher, I hereby award treble damages against her in the amount of $74,643.60.
7. Under the theory of respondeat superior, an employer is vicariously liable for multiple damages for an employee’s willful violation of Chapter 93A if done within the scope of employment. International Brotherhood of Police Officers, Local 433 v. Memorial Press, Inc., 31 Mass.App.Ct. 138, 140 (1991). There is no question that King’s activities occurred within the scope of her employment at Wheeler & Taylor. Therefore, I hereby assess treble damages against Wheeler & Taylor in the amount of $74,643.60.
8. G.L.c. 93A, §9(4) provides: “If the court finds in any action commenced hereunder that there has been a violation of §2, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys fees and costs incurred in connection with said action.” Accordingly, the plaintiffs are entitled to receive their reasonable attorneys fees and costs from all three defendants. Counsel for the plaintiffs shall, within 30 days from the date hereof, submit to this court an affidavit setting forth the amount of attorneys fees and costs claimed by the plaintiffs in connection with this matter. Upon receipt of such affidavit, counsel for the defendants shall have 14 days in which to file a written opposition to any item claimed in such affidavit. Upon receipt of both the affidavit and the oppositions, if any, the court will then determine whether a hearing is necessary. Thereafter, the court will determine the amount of attorneys fees and costs to be added to the judgment.
ORDER
For the foregoing reasons, JUDGMENT shall enter as follows:
1. On Count II, for the plaintiffs in the amount of $74,643.60, plus attorneys fees and costs to be hereafter determined.
2. On Count IV, for the plaintiffs in the amount of $74,643.60, plus attorneys fees and costs to be hereafter determined.
3. On Count VI, for the plaintiffs in the amount of $49,762.40, plus attorneys fees and costs to be hereafter determined.
4. As among the various counts against each individual defendant, the plaintiffs shall be limited to a single recovery.

Ghitalla was renting the house to a family with children before she sold it.