AMERICAN SHOOTING SPORTS COUNCIL, INC., & others[1] *vs.*
ATTORNEY GENERAL.

Suffolk. February 4, 1999. - June 30, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Attorney General. Firearms. Consumer Protection Act,* Unfair or deceptive
act, Sale of handgun. *Regulation.*

This court concluded that certain regulations promulgated by the Attorney
General, prohibiting the commercial sale or transfer of handguns failing to
satisfy prescribed safety and performance requirements, constituted a
proper exercise of the Attorney General's authority under G. L. c. 93A,
§ 2 (*c*), to prevent the deceptive or unfair sale or transfer of defective
products which do not perform as warranted [875-878], and of the At-
torney General's authority to apply G. L. c. 93A to acts and practices
which the Legislature had defined as unlawful in St. 1998, c. 180, an act
relative to gun control in the Commonwealth [878-882].

CIVIL ACTION commenced in the Superior Court Department on
January 13, 1998.

The case was heard by *Diane M. Kottmyer,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*Glenn Kaplan,* Assistant Attorney General, for the defendant.

*Frank A. Libby, Jr.,* for the plaintiffs.

The following submitted briefs for amici curiae:

*Michael E. Malamut* for Associated Industries of Mas-
sachusetts.

*John A. Wortmann, Jr., & Michael Paris* for Center to Prevent
Handgun Violence & others.

GREANEY, J. We are asked to determine whether the Attorney
General lacked authority under G. L. c. 93A, § 2 (*c*), to

[1]Sporting Arms and Ammunition Manufacturers Institute, Inc.; Sturm,
Ruger & Co., Inc.; Smith & Wesson Corp.; Glock, Inc.; Taurus Firearms
International Company, Inc.; Eldon McElhiney, doing business as McEl-
hiney's; and Wayne Marshall, doing business as Gloucester Cobbler.

promulgate 940 Code Mass. Regs. §§ 16.00 et seq. (1997), in particular, §§ 16.03, 16.04, 16.05, 16.06(3), and 16.07, which define deceptive or unfair acts or practices in the transfer, or offer to transfer, of certain types of handguns to a consumer in the Commonwealth. The regulations, which were promulgated in October, 1997, essentially prohibit the commercial sale or transfer of handguns that fail to satisfy prescribed safety and performance requirements.

The plaintiffs filed a complaint in the Superior Court seeking declaratory and injunctive relief to prevent the Attorney General from enforcing the regulations. They alleged that, by promulgating the regulations, the Attorney General exceeded his authority under G. L. c. 93A, § 2 (*c*), and that the regulations are arbitrary and capricious in violation of G. L. c. 30A, § 7. The plaintiffs further alleged that the regulations violated their rights under various provisions of the United States Constitution and 42 U.S.C. § 1983 (1994).

A few days before certain provisions of the handgun sales regulations were scheduled to take effect, the plaintiffs filed an application for a preliminary injunction, seeking to enjoin the Attorney General from enforcing the provisions on the ground that they are ultra vires.[2] The provisions define as an unfair or deceptive practice the sale of a handgun (a) without a tamper-resistant serial number (§ 16.03)[3]; (b) made from inferior

---

[2]The handgun sales regulations were to be implemented in three phases: January 15, 1998; June 30, 1998; and September 30, 1998. At the June 24, 1998, Superior Court hearing on the plaintiffs' application for a preliminary injunction, the plaintiffs stated that they were not seeking injunctive relief from enforcement of those regulations that took effect on January 15, 1998, in particular, 940 Code Mass. Regs. §§ 16.01 (defining certain terms in the regulations), 16.02 (providing that failure to comply with the handgun sales regulations or any other statutes, regulations, or rules related to the unlawful transfer of handguns is an unfair or deceptive practice), 16.08 (severability clause), 16.06(1), and 16.06(2) (regarding safety warnings and disclosures).

[3]Section 16.03 makes it an unfair or deceptive practice for a handgun-purveyor to transfer, or offer to transfer, to any customer located in the Commonwealth a handgun which has the serial number placed solely in a location where it is susceptible to eradication. A serial number is not susceptible to eradication if (1) it is placed on the interior of the handgun; or (2) it is placed on the exterior of the handgun in a way that is not visible to the unaided eye, but is visible with the aid of an infrared detector or other device. The handgun-purveyor is required to furnish information regarding the serial number to the Attorney General and other law enforcement officials on request. 940 Code Mass. Regs. § 16.03.

materials (§ 16.04)[4]; (c) without childproofing or safety devices (§ 16.05)[5]; and (d) with a barrel shorter than three inches, un-

[4]Section 16.04 makes it "an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth any make and model of handgun that: (1) has a frame, barrel, cylinder, slide or breechblock: (a) composed of any metal having a melting point of less than 900°F, (b) composed of any material having an ultimate tensile strength of less than 55,000 pounds per square inch, or (c) composed of any powdered metal having a density of less than 7.5 grams per cubic centimeter; or (2) is prone to repeated firing based on a single pull of the trigger, prone to the explosion of the handgun during firing with standard ammunition, or prone to accidental discharge." 940 Code Mass. Regs. § 16.04.

The regulations define "[p]rone to accidental discharge" as the failure of five handguns of the make and model at issue, in new condition, to pass the handgun drop test. 940 Code Mass. Regs. § 16.01. The "[h]andgun [d]rop [t]est" involves dropping a handgun which has been test loaded and is ready to fire onto a solid slab of concrete from a height of one meter from each of six different positions. *Id.*

Handguns are exempt from this requirement on satisfying the "[m]ake and [m]odel [p]erformance [r]equirements" which require three new handguns of the make and model in question to pass the "[h]andgun [p]erformance [t]est." 940 Code Mass. Regs. §§ 16.04(3) and 16.01. The "[h]andgun [p]erformance [t]est" entails firing 600 rounds of ammunition with the handgun being tested. A handgun that (a) fires the first twenty rounds without a malfunction, and (b) fires the full 600 rounds with no more than six malfunctions and without any crack or breakage of an operating part of the handgun which increases the danger of injury to the user, passes the test. 940 Mass. Code Regs. § 16.01.

Sections 16.04(1) and (2) do not apply to the sale of a handgun previously sold at retail to a consumer, which was manufactured before the enforcement date of the regulations and for which the handgun-purveyor provides a sworn certification that he or she has performed, and the handgun has satisfied, the handgun drop test and the handgun performance test. 940 Code Mass. Regs. § 16.07(3) and (4).

[5]Section 16.05 makes it an unfair or deceptive practice for a handgun-purveyor to transfer or offer to transfer to any customer located within the Commonwealth a handgun which does not contain (1) a mechanism to hinder the use of the handgun by unauthorized users, such as key-activated trigger locks, combination handle locks, and solenoid use-limitation devices; and (2) a mechanism which operates to prevent an average five year old child from operating the handgun when it is ready to fire, such as increasing trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions to operate the handgun. 940 Code Mass. Regs. § 16.05.

Section 16.05(2) does not apply to handguns which have a hammer deactivation device. 940 Code Mass. Regs. § 16.05(4). Furthermore, where the handgun has a mechanism to load cartridges by way of a magazine, the

less certain disclosures are made to the customer (§ 16.06[3]).[6] A judge in the Superior Court allowed the plaintiffs' application, in substantial part, after concluding that the plaintiffs "established a strong likelihood that they will succeed in establishing that the challenged Regulations are invalid on the grounds that they are ultra vires," and that "failure to grant the [preliminary] injunction will irreparably harm [them]."

The Attorney General appealed, pursuant to G. L. c. 231, § 118, second par., from the order entered on the preliminary injunction. We granted his application for direct appellate review.

1. In reaching her conclusion that the Attorney General lacked statutory authority to promulgate the regulations, the judge determined that, while "the harm which [G. L. c.] 93A seeks to prevent is primarily economic harm arising out of disparity in bargaining power between a merchant and a customer[,] [the regulations] seek to address the threat to the public safety posed by defective and otherwise unsafe handguns." The judge further determined that "the power granted to the Attorney General by [G. L. c. 93A,] § 2 (*c*), does not encompass the power to establish design and performance standards for products sold in

handgun must have a load indicator or a magazine safety disconnect. 940 Code Mass. Regs. § 16.05(3). Sections 16.05(2) and (3) do not apply to the sale of a handgun that previously has been sold at retail to a consumer and that was manufactured prior to the enforcement date of the regulation. 940 Code Mass. Regs. § 16.07(1).

[6]Section 16.06(3) makes it an unfair or deceptive practice for a handgun-purveyor to transfer to a customer located within the Commonwealth a handgun that has a barrel shorter than three inches, unless he or she discloses the limits of the accuracy of the make and model of handgun by providing in writing to the customer (prior to sale) the make and model's average group diameter test result at seven, fourteen, and twenty-one yards. 940 Code Mass. Regs. § 16.06(3).

"Group diameter test result" means "the largest spread in inches between the centers of any of the holes made in a test target after firing five rounds from the handgun in question at the target from a set distance." 940 Code Mass. Regs. § 16.01. "Average group diameter test result" means "the arithmetic mean of three separate group diameter test results taken from a set distance." *Id.*

Section 16.06(3) does not apply to the transfer of a used handgun that previously has been sold at retail to a consumer and was manufactured before the enforcement date of the regulation where the handgun-purveyor provides in writing to the customer in advance of the sale the handgun's group diameter test result at seven, fourteen, and twenty-one yards. 940 Code Mass. Regs. § 16.07(2).

Massachusetts." She concluded that the "core of conduct encompassed within the phrase 'business acts and practices' is the manner and means used by merchants to market products and services to consumers." The Attorney General asserts that the judge erred by narrowly confining his regulatory authority to product marketing issues, and in concluding that G. L. c. 93A is aimed primarily at economic injury. The question concerns the scope of the Attorney General's authority in this area, and it is a question of law.

We shall first take up the nature of the Attorney General's authority. We conclude that he has the authority to regulate with respect to the type of handguns involved on two bases: (a) his authority pursuant to G. L. c. 93A, § 2 (*c*), to prevent the deceptive or unfair sale or transfer of defective products which do not perform as warranted, and (b) his authority to apply G. L. c. 93A to acts and practices which the Legislature has defined as unlawful. As a consequence, we also conclude that the premise on which the preliminary injunction was issued is wrong; that some of the regulations can be implemented immediately; and that, as to the remaining regulations in dispute, there must be further proceedings in the Superior Court to determine their validity and to decide the other claims in the case.

(a) Section 2 (*a*) of G. L. c. 93A "states the substantive core of the act: 'Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.' " *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 766 (1980). Subsection (*b*) instructs the courts to define "unfair or deceptive acts" with reference to "the interpretations given by the Federal Trade Commission [FTC] and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. [§] 45[a][1]) [FTC Act], as from time to time amended." It is within this context that subsection (*c*) permits the Attorney General to "make rules and regulations interpreting the provisions of subsection 2 (*a*)," so long as they are not "inconsistent with the rules, regulations and decisions of the [FTC] and the Federal Courts interpreting the provisions of [the FTC Act], as from time to time amended." Thus, § 2 generally limits the Attorney General's rule-making power to be within the concepts of deception or unfairness, as guided by administrative and judicial interpretation of the FTC Act. *Purity Supreme, supra* at 776.

In addition to the above, the Attorney General's power is

limited in certain other respects. He cannot regulate under G. L. c. 93A in areas where the regulation is expressly or implicitly proscribed by law or by judicial decision. See G. L. c. 93A, § 3. See also *Reiter Oldsmobile, Inc. v. General Motors Corp.*, 378 Mass. 707, 711-712 (1979); *DePasquale v. Ogden Suffolk Downs, Inc.*, 29 Mass. App. Ct. 658, 662 (1990). He also generally cannot regulate in a way which conflicts with legislation. Cf. *Lowell Gas Co. v. Attorney Gen.*, 377 Mass. 37, 42-43 (1979); *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 76-78 (1977).[7] Further, Federal law generally preempts State regulation of many consumer products (but not firearms), as defined by statute. See the Consumer Product Safety Act, 15 U.S.C. §§ 2075(a), 2052 (1994).[8] There are other limitations on the Attorney General's authority that we need not set forth here as they do not concern the issue before us.

With respect to the regulation of product safety and performance, the following considerations have pertinence to the Attorney General's authority. The Attorney General may not use his regulatory authority to pursue general policy goals or public issues that limit or ban the sale of lawful products under the general rubric that purchasers of the products, or third parties who may come into contact with them, would be better off if the products were not marketed at all. Questions concerning whether such products should be sold, or their sales restricted, are primarily legislative in character, and, if regulation by

[7]In *Schubach v. Household Fin. Corp.*, 375 Mass. 133, 137-138 (1978), we recognized that a particular act or practice, even if authorized by statute, might, in certain circumstances, be unfair or deceptive under G. L. c. 93A. See *United Cos. Lending Corp. v. Sargeant*, 20 F. Supp. 2d 192, 200 (D. Mass. 1998); *DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85, 96 (1983).

[8]While Congress exempted certain products from coverage under the Consumer Products Safety Act (CPSA), most of those products are regulated by other comprehensive Federal regulatory schemes. The fact that these products are exempted from the CPSA because they are regulated by other Federal agencies does not mean that States are free to regulate these products in any manner they see fit. See, e.g., 49 U.S.C. § 30103(b)(1) (1994) (States preempted from setting automobile product standards where Federal standard in effect); 7 U.S.C. § 136v (1994) (preempting inconsistent State regulation of pesticides); 21 U.S.C. §§ 301 et seq. (Federal Food, Drug, and Cosmetic Act establishing comprehensive Federal scheme regulating food, drugs, health devices, and cosmetics); 49 U.S.C. §§ 44701 et seq. (1994) (establishing comprehensive Federal scheme to regulate aircraft safety). Only certain of the exempted products, such as firearms, are subject to State review. See 15 U.S.C. § 2052(a)(1)(E) (1994).

government agencies is to occur, it is ordinarily to be done pursuant to a delegation of authority by the Legislature. The Attorney General may, however, regulate in an area not otherwise withheld from his consideration, even if the regulation may affect the ability of the vendor to sell its product, if he can establish that the regulations define acts or practices which violate G. L. c. 93A, § 2 (*a*). See *Purity Supreme, supra* at 775.

In this context, the Attorney General may regulate deceptive or unfair acts or practices in the sale of products which fail fundamental requirements of safety and performance. Here, we are in an area where the purchaser is sold a product which the purchaser reasonably believes is safe, if used as directed, and will perform in the manner expected of like products. If, during ordinary use in keeping with directions, the product performs in a deviantly unsafe or unexpected way, the product's sale has occurred in circumstances which make the sale deceptive or unfair. This is especially so where harmful or unexpected risks or dangers inherent in the product, or latent performance inadequacies, cannot be detected by the average user or cannot be avoided by adequate disclosures or warnings. See *Commonwealth* v. *Johnson Insulation*, 425 Mass. 650, 660-661 (1997) ("An article is not unreasonably dangerous merely because some risk of harm is associated with its use, but only where it is dangerous 'to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' Restatement [Second] of Torts . . . § 402A comment i, at 352 [1965]").

An example may be helpful at this point. A power lawnmower possesses certain dangers, many of which are apparent, and all of which can be guarded against by proper disclosures and warnings. If used as expected the power lawnmower will safely and adequately cut grass. However, a power lawnmower which blows up, or catches fire when used in a normal manner, or which cannot adequately cut grass does not perform in an expected way. A consumer could validly claim that, in acquiring such a lawnmower, he has been dealt with unfairly and deceptively. The Attorney General possesses authority under G. L. c. 93A, § 2 (*c*), in the interests of consumer protection, to regulate the sale of products that are unsafe or defective in ways that a purchaser cannot foresee. Such products fail to conform to standards of merchantability, and, where applicable,

to standards governing fitness for a particular use. See G. L. c. 106, §§ 2-314[9] and 2-315.[10] This authority is based on the settled rules that the sale of products posing unforeseeable dangers constitutes conduct recognized as falling within the prohibitions of G. L. c. 93A, § 2 (*a*), see, e.g., *Calimlim* v. *Foreign Car Ctr., Inc.*, 392 Mass. 228, 236 (1984) (knowing sale of defective automobile); *Burnham* v. *Mark IV Homes, Inc.*, 387 Mass. 575, 581 (1982) (sale of defective modular home); *Linthicum* v. *Archambault*, 379 Mass. 381, 387 (1979) (defective roof); *Whelihan* v. *Markowski*, 37 Mass. App. Ct. 209, 210-211 (1994) (property manager knowingly placed plate glass rather than safety glass in tenant's rear door), and that a breach of warranty constitutes an unfair or deceptive practice in violation of G. L. c. 93A. See *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 193 (1990), and cases cited.

While case-by-case adjudication whether a particular product is defective, unmerchantable, or unfit constitutes one way in which the product's sale may be defined as an unfair or deceptive act or practice under G. L. c. 93A, § 2 (*a*), regulation by the Attorney General, if otherwise proper, constitutes an equally valid method for defining conduct unlawful under the statute. The Attorney General has, through the regulations, sought to take preventative action as to defective handguns, consistent with the authority granted to him by the Legislature of "defining with specificity acts and practices which violate G. L. c. 93A, § 2 (*a*)." *Purity Supreme, supra* at 775.[11]

(b) A second basis of general authority exists to support the

[9]General Laws c. 106, § 2-314, provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." To be merchantable, goods must "be fit for the ordinary purposes for which such goods are used." G. L. c. 106, § 2-314 (1), (2) (*c*).

[10]An implied warranty of fitness for a particular purpose exists "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods . . . ." G. L. c. 106, § 2-315.

[11]In reaching this conclusion, we reject the plaintiffs' contention, accepted by the judge, that the Attorney General's regulatory authority under G. L. c. 93A, § 2 (*c*), to interpret the meaning of unfair or deceptive acts or practices in § 2 (*a*) is limited to issues concerning product marketing and disclosure. The plaintiffs insist that "[t]he language and structure of c. 93A, and in particular, the rulemaking aspects of the statutory scheme . . . focus upon the consumer-merchant relationship, requiring certain disclosures so that the

Attorney General's promulgation of the regulations. Subsequent to the issuance of the regulations, and during the pendency of this litigation, St. 1998, c. 180, "An Act relative to gun control in the commonwealth" (Act), was enacted into law. The Act amends numerous provisions of G. L. c. 140, §§ 121-131P, dealing with the sale of firearms, to impose criminal and other penalties on licensed firearms merchants who transfer firearms, including handguns, in violation of the Act's prohibitions.[12] Insofar as relevant here, various provisions found in the Act repeat virtually word for word the content of certain of the Attorney General's regulations.[13,14]

The Attorney General points to the Act as conferring general

---

consumer may be sufficiently informed at point of sale to exercise meaningful choice." Confining the Attorney General's regulatory authority in this way is contrary to the concept of "unfairness" as it has evolved through judicial interpretations, see, e.g., *McGrath* v. *Mishara*, 386 Mass. 74, 82-83 (1982) (landlord's illegal deducting of rent from tenants' security deposit); *Ellis* v. *Safety Ins. Co.*, 41 Mass. App. Ct. 630, 640 (1996) (defendant's discriminatory failure to pay insurance claim), through legislation, see, e.g., G. L. c. 140, § 131K, inserted by St. 1998, c. 180, § 47 (failure to provide safety locks on firearms); G. L. c. 111, § 70F ("HTLV-antibody" test as condition of employment), and through other regulations promulgated by the Attorney General pursuant to G. L. c. 93A, § 2 (*c*), see, e.g., 940 Code Mass. Regs. § 3.16(3) (1993) (violations of other consumer-related statutes); 940 Code Mass. Regs. §§ 4.00 (1994) (long-term care facilities).

[12]At the time the preliminary injunction issued in this case, St. 1998, c. 180, "An Act relative to gun control in the commonwealth" (Act), had not yet been enacted into law. Accordingly, the judge had not considered the relevance of the Act for purposes of the questions presented for our review in this case.

[13]Paragraph (1) and the first sentence of paragraph (3) of § 16.04(1) parallel the requirements imposed in G. L. c. 140, § 123, Eighteenth, including the performance standards incorporated in the "[h]andgun [p]erformance [t]est," "[m]ake and [m]odel [p]erformance [r]equirements," and handgun "[m]alfunction," as those terms are defined in § 16.01 of the regulations. The only difference is that the statute precludes the sale of any firearm composed of "any *metal* having an ultimate tensile strength of less than 55,000 pounds per square inch," while the regulation refers to "any *material*." Section 16.04(2), referencing the "[h]andgun [d]rop [t]est" defined in § 16.01 for purposes of ascertaining whether a handgun is "prone to accidental discharge," tracks G. L. c. 140, § 123, Nineteenth. Section 16.04(2), regarding whether a handgun is prone to repeated firing based on a single pull of the trigger, and whether it is prone to explosion, tracks G. L. c. 140, § 123, Twentieth. Section 16.06(3), and the handgun testing requirements mandated for purposes of the "make and model's average group diameter test result," "average group diameter test result," and "group diameter test result," as defined in § 16.01, are virtually identical to the provisions of G. L. c. 140, § 123, Twenty-first.

[14]The only substantive regulations that do not have express counterparts in

authority on him to impose G. L. c. 93A liability in the regulations as an adjunct to safety and performance requirements imposed by the Legislature on handguns in order to protect the public's health, safety, or welfare. The general authority claimed by the Attorney General has been recognized both with respect to 940 Code Mass. Regs. § 3.16(3) (1993),[15] see *Calimlim* v. *Foreign Car Ctr., Inc., supra* at 235; *MacGillivary* v. *W. Dana Bartlett Ins. Agency of Lexington, Inc.*, 14 Mass. App. Ct. 52, 60-61 (1982); see also *Piccuirro* v. *Gaienby*, 20 Mass. App. Ct. 286, 290 (1985), and with respect to the Attorney General's implementation of specific G. L. c. 93A liability in connection with legislation or regulations promulgated by other agencies, prohibiting certain conduct. See *Rudow* v. *Commissioner of the Div. of Medical Assistance, ante* 218, 226 & n.10 (1999) (940

the Act, or for which injunctive relief was not sought by the plaintiffs, see note 2, *supra*, include the provisions of § 16.04(3) concerning verification that the handgun make and model at issue meets the specified performance requirements, and providing for independent testing of the make and model at the Attorney General's discretion, and § 16.07 concerning transfers of used handguns.

There are some provisions of the regulations which overlap with existing legislation, including the Act, but may impose differing requirements. For example, § 16.05 of the regulations, concerning the transfer of handguns without childproofing or safety devices, imposes different requirements from those found in the Act. See G. L. c. 140, § 131K, inserted by St. 1998, c. 180, § 47. The Act specifies that firearms, including handguns, delivered without locking devices are "defective," and that their sale is a violation of G. L. c. 93A. *Id.* The locking devices are required to be approved by the colonel of the Department of State Police. *Id.* The Attorney General has indicated that he intends to make the regulations consistent with the Act by amending § 16.05 to incorporate the requirements of the Act. In addition, § 16.03 of the regulations, concerning tamper-resistant serial numbers, addresses an area where the Legislature has imposed certain requirements. See G. L. c. 269, §§ 11C and 11E. Finally, the Act exempts from the requirements found in G. L. c. 140, § 123, Eighteenth to Twenty-first, the sale of firearms stockpiled before the statute's effective date, see St. 1998, c. 180, § 79, whereas the regulations do not exempt such sales.

[15]Title 940 Code Mass. Regs. § 3.16(3) provides that an act or practice violates G. L. c. 93A, § 2, if "[i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection." Cf. 940 Code Mass. Regs. § 3.16(4) (1993) (stating that an activity is unfair if it violates the FTC Act, the Federal Consumer Credit Protection Act, or "other Federal consumer protection statutes within the purview of [G. L. c. 93A, § 2]").

Code Mass. Regs. §§ 4.00 et seq. [1994] [long-term care facilities]); *Boston Hous. Auth.* v. *Howard*, 427 Mass. 537, 539 (1998) (940 Code Mass. Regs. § 3.17 [1993] [landlord-tenant regulations]); *Urman* v. *South Boston Sav. Bank*, 424 Mass. 165, 168-170 (1997) (940 Code Mass. Regs. § 3.16[2] [1993] [disclosure regulation]); *Maillet* v. *ATF-Davidson Co.*, *supra* at 193 (940 Code Mass. Regs. § 3.08[2] [1993] [warranty regulations]); *Calimlim* v. *Foreign Car Ctr., Inc.*, *supra* at 229-230 (940 Code Mass. Regs. § 5.04[2][g] [1978] [motor vehicle regulations]); *Hannon* v. *Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 821 (1982) (warranty regulations); *Homsi* v. *C.H. Babb Co.*, 10 Mass. App. Ct. 474, 478-479 (1980) (disclosure regulation). As has been mentioned, the Attorney General's power continues to exist unless the promulgated regulations conflict with the legislative scheme, see, e.g., *Lowell Gas Co.* v. *Attorney Gen.*, 377 Mass. 37, 42-43 (1979); *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 76-78 (1977), or the area is one as to which the Legislature has expressly or implicitly covered the field in a way which precludes further remediation by regulation under G. L. c. 93A. See *Reiter Oldsmobile, Inc.* v. *General Motors Corp.*, *supra* at 711-712; *DePasquale* v. *Ogden Suffolk Downs, Inc.*, *supra* at 662.

The plaintiffs accept this authority in its broad terms when they say in their brief the following: "The Attorney General points out (and Plaintiffs do not dispute), that violation of a statute designed to protect the public's 'health, safety or welfare' is deemed, by independent operation of 940 [Code Mass. Regs.] § 3.16 (3), a violation of c. 93A." The plaintiffs then go on to attempt to refute the existence of this authority in this case by putting forth the following argument: "In making this (generic) reference to 'unfairness,' and attempting, essentially, to equate his regulatory authority with that of the Legislature, the Attorney General blithely ignores a key point . . . 'violations' of these 'statutory standards' are deemed 'unfair practices' *only* after a plaintiff brings a claim for relief which is then litigated with reference to the aforementioned statute and, ultimately, *adjudicated* in plaintiff's favor. At bottom, none of this reasoning speaks at all to the Attorney General's power to regulate in the first instance under [§] 2 (c)." (Emphasis in original.)

This argument is wrong. As we have said, while reliance on 940 Code Mass. Regs. § 3.16(3) is one way the Attorney General may seek to impose G. L. c. 93A liability, he has

consistently promulgated regulations, on a preventative basis, to coordinate G. L. c. 93A liability with legislative proscription of unlawful conduct.[16] It is of no significance that the Act came after the regulations. Except as noted below,[17] we also do not see an impediment to the Attorney General's authority in the fact that the Act confers on the colonel of the Department of State Police and the Secretary of the Executive Office of Public Safety the authority to promulgate regulations which implement its provisions. St. 1998, c. 180, §§ 2, 21. The Act is predominantly criminal in nature and these public officials would logically be expected to be chosen by the Legislature as the parties who are in the best position to further define its provisions.[18] We see no reason to draw from the Legislature's delegation of authority to these officials an implied preclusion of authority on the part of the Attorney General to act under G. L. c. 93A. We are satisfied that the Attorney General has an independent basis of authority to regulate in the area of handgun sales for the reasons just discussed.

In summary, we are satisfied that the Attorney General's regulatory authority under G. L. c. 93A, § 2 (*c*), regarding defective products is not limited to marketing and disclosure issues as the plaintiffs contend. His authority properly extends to regulating the sale of a product as unfair or deceptive when the product is defective in ways which a purchaser would not anticipate or the product is not as warranted, and to regulating in a manner which coordinates G. L. c. 93A liability with legislation declaring certain acts unlawful.

---

[16]See, e.g., 940 Code Mass. Regs. § 3.08(2) (1993) (warranty); 940 Code Mass. Regs. § 3.17 (1993) (landlord-tenant); 940 Code Mass. Regs. §§ 4.00 et seq. (1994) (long-term care facilities); 940 Code Mass. Regs. §§ 7.00 et seq. (1986) (debt collection); 940 Code Mass. Regs. §§ 10.00 et seq. (1996) (manufactured housing communities).

[17]The Act provides for the colonel of the Department of State Police to approve safety devices designed to prevent the discharge of firearms by unauthorized users. See G. L. c. 140, § 131K, inserted by St. 1998, c. 180, § 47. In keeping with the principles we have discussed, to the extent § 16.05 of the Attorney General's regulations conflict with the Act, they are invalid.

[18]The Attorney General has on other occasions promulgated regulations in areas that concurrently are regulated by other agencies. See, e.g., 940 Code Mass. Regs. §§ 4.00 et seq. (long-term care facility regulations); 940 Code Mass. Regs. §§ 9.00 et seq. (1986) (insurance regulations); 940 Code Mass. Regs. §§ 8.00 et seq. (1993) (mortgage regulations). See also *United Cos. Lending Corp.* v. *Sargeant*, 20 F. Supp. 2d 192, 200 (D. Mass. 1998) (upholding Attorney General's mortgage broker regulations).

(c) So viewed, the Attorney General's action is not inconsistent or incongruent with the rules, regulations, and decisions of the FTC or the Federal Courts' interpretations of the FTC Act. The FTC has deemed "[u]njustified consumer injury" as "the primary focus of the FTC Act," 1980 Unfairness Statement, reprinted at 104 F.T.C. 1070, 1073 (1984), and has expressly stated that "unwarranted health and safety risks may support a finding of unfairness." *Matter of Int'l Harvester Co.*, 104 F.T.C. 949, 1061 (1984), quoting 1980 Unfairness Statement, *supra*. Certainly the health and safety risks associated with a defective product would be unjustified.[19]

(d) Finally, the judge's determination that G. L. c. 93A is restricted primarily, if not exclusively, to addressing economic harm is not supported by our cases interpreting the statute. We have expressly recognized that the category of injuries cognizable under G. L. c. 93A extends to other kinds of injuries. See *Maillet* v. *ATF-Davidson Co.*, *supra* at 192 (personal injuries cognizable under G. L. c. 93A); *Leardi* v. *Brown*, 394 Mass.

---

[19]The Federal Trade Commission's (FTC's) unfairness jurisdiction is not limited to marketing and disclosure issues as the plaintiffs contend, nor, as discussed above, has G. L. c. 93A been viewed by the courts, the Legislature, or the Attorney General regulating in other areas, to be so limited. Relying on *Matter of Int'l Harvester Co.*, 104 F.T.C. 949 (1984), and the FTC's 1964 Statement of Purpose of Trade Regulation Rule, 29 Fed. Reg. 8324, 8354 (1964), the plaintiffs contend that product safety regulations governing the sale or use of dangerous products are beyond the scope of the FTC's unfairness jurisdiction, and thus beyond the scope of G. L. c. 93A. The plaintiffs obfuscate the issue in this case. We are not concerned in this case with the Attorney General's proposed regulation of products that, although dangerous in nature, may nonetheless be merchantable because they are "fit for the ordinary purposes for which [they] are used." G. L. c. 106, § 2-314 (1), (2) (*c*). Rather, at issue is the propriety of regulations governing the sale of products that are defective and thereby unmerchantable. The fundamental purpose of the regulations is to assure consumers that the products they are purchasing, although dangerous, nonetheless are merchantable. The FTC clearly has jurisdiction to regulate the sale of defective products. See, e.g., *Matter of Int'l Harvester Co.*, *supra* (where FTC determined that manufacturer's failure to take adequate measures to inform consumers of simple measures by which they could have avoided injury from product was unfair practice); *Matter of Philip Morris, Inc.*, 82 F.T.C. 16 (1973) (where FTC determined that distribution of sample razor blades by means of home-delivered newspapers constituted a "hazard to . . . health and safety," and was thus an unfair practice); *Matter of Chemway Corp.*, 78 F.T.C. 1250 (1971) (where FTC determined that it was an unfair practice to sell a toothbrush treated with a solution of phenyl mercuric acetate, a product that may constitute a danger to the consumer by adding to the body's burden of mercury).

151, 158-159 (1985) (compensable injuries under G. L. c. 93A need not involve loss of money or property but include any "invasion of any legally protected interest of another"). See also *Matter of Int'l Harvester, supra* at 1064 & n.54 (FTC's jurisdiction reaches personal injury).

2. We come now to the disposition of the appeal. The conclusions we have reached both establish that the Attorney General's authority is not as rigidly limited as the judge determined, and dissipate the legal grounds on which the preliminary injunction was granted. The plaintiffs make no other arguments, apart from those we have considered and rejected, to support the allowance of a preliminary injunction as broad as the one entered. Accordingly, the preliminary injunction is vacated. We see no reason not to allow the immediate implementation of those regulations which are not the subject of dispute[20] and those regulations which exactly or substantially replicate provisions of the Act restricting the sale or transfer of nonconforming handguns.[21] The Superior Court should hold a prompt hearing to identify such regulations and thereafter enter an order which allows their implementation. We expect that the Attorney General will take no action to implement any of the regulations until the question of the validity of the regulations just described is

[20]For example, the judge permitted the implementation of so much of § 16.06(3) of the regulations as require disclosure of available test results for the same make and model of handguns.

[21]In his main brief, the Attorney General points out that the Act exempts manufacturers from coverage, instead placing liability on local firearms dealers. See St. 1998, c. 180, § 8. The plaintiffs make no argument that the regulations' applicability to handgun manufacturers creates a difference between the statute and the regulations that is of any relevance. We agree with the Attorney General's position that the distinction is not pertinent, and we discern nothing in the Act which either explicitly or implicitly excludes application of G. L. c. 93A liability to a broader category of persons or entities than those designated in the Act. The Legislature has defined certain conduct related to the sale of guns as unlawful, and we do not perceive any reason why the Attorney General may not regulate, as an adjunct to the Act and in a way that does not conflict with the Act, to prevent the sale of the unlawful products to consumers by stopping the flow of the products into Massachusetts. Cf. *Lowell Gas. Co.* v. *Attorney Gen.*, 377 Mass. 37, 42 (1979) ("the mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute" such as G. L. c. 93A). Moreover, the regulations are designed to ensure that sales not destined for Massachusetts consumers are not affected by the regulations. See, e.g., 940 Code Mass. Regs. § 16.07 (excluding various types of sales from the regulations). We note as well that two of the plaintiffs appear to be firearms dealers and not manufacturers.

settled. Implementation of the remaining disputed regulations is to be stayed. As to these regulations, there are to be further proceedings in the Superior Court to determine their validity, and to dispose of the plaintiffs' other claims that relate to these regulations. When the proceedings are concluded, an appropriate declaratory judgment and orders are to be entered.

*So ordered.*